IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:10-CV-230-H(2)

JAMES K. SANDERFORD,  )
　　　　　　　　　　　　)
　　Plaintiff,         )
　　　　　　　　　　　　)
　　　　　　　　　　　　)
　v.                   )         **ORDER**
　　　　　　　　　　　　)
　　　　　　　　　　　　)
DUPLIN LAND DEVELOPMENT, )
INC.,                  )
　　　　　　　　　　　　)
　　Defendant.         )

This matter is before the court on defendant's motions for judgment on the pleadings and for summary judgment. Appropriate responses and replies have been filed, and the time for further filings has expired. This matter is ripe for adjudication.

### BACKGROUND

Defendant is the owner and developer of River Landing, a 1,400 acre residential development and golf course located in Duplin County, North Carolina. Plaintiff owns a small construction company and is from Wilmington, North Carolina.

In the Fall of 2006, plaintiff's neighbor, Robert MacFarland Rogerson ("Mac Rogerson") approached plaintiff about real estate deals in River Landing, specifically about a section

called the Bluffs. He also told plaintiff about the Murphy family, who owned defendant, and about his positive experience with the Murphys and defendant. Plaintiff and his wife attended an opening event for the Bluffs during the fall of 2006. Before the end of the event, plaintiff put a $5,000 deposit on Lot 60 in the Bluffs ("the Lot") and entered into a Lot Reservation Agreement. Plaintiff was told he could not enter into a formal contract at the opening event because defendant was completing regulatory work necessary to legally sell lots in the Bluffs.

In February 2007, Mac Rogerson and defendant's sales staff were informed during a sales meeting that environmental testing had revealed high levels of fecal coliform in the development. As a result, the sales staff was informed that defendant could not enter into any contracts to sell lots in the Bluffs. The sales staff was told to call the prospective purchasers and let them know defendant would remediate the issue as quickly as possible.

Some time later, a second sales meeting was called at which time the staff was informed that those with Lot Reservation Agreements in place could enter into binding contracts, even though the fecal coliform levels had not yet deteriorated to acceptable levels. They were informed that the fecal coliform would naturally deteriorate over time, and defendant would

include an addendum to the Standard Purchase Agreement which would formally disclose the fecal coliform issue and provide that an independent environmental consulting firm would undertake additional sampling and testing of the lots located in the Bluffs.

In March 2007, Mac Rogerson delivered a proposed Lot Purchase Agreement for Lot 60 to plaintiff. The agreement contained an Addendum B, which disclosed (1) that the fecal coliform level was due to contaminated mulch, (2) that the Report of the Clark Group indicated that the fecal coliform is naturally degrading and would not be a factor after the passage of time, and (3) that the property will be suitable for residential development pending completion of the degradation processes. The report was available for inspection and copying at the office of the defendant. Addendum B also provides, in pertinent part:

> Furthermore, Purchaser acknowledges and agrees that no construction activities shall be undertaken on the Lot by Purchaser until the Clark Group, or other qualified consulting firm, undertakes additional sampling at the Property, and the [defendant] obtains a written report from the consultant indicating that results of that sampling confirm previously identified fecal coliform has degraded to an acceptable level ("Confirmatory Report"). At such time, Seller shall notify Purchaser that based on the Confirmatory Report, the Property is ready for construction. It is estimated that the Property will be in suitable condition no later than November 1, 2007. If, the Seller does not receive the Confirmatory Report and notify Purchaser of the same

3

by November 1, 2007, then the Seller and Purchaser
will agree to (i) terminate the Contract and return
all monies deposited, thereby mutually releasing the
Seller and Purchaser from all obligations; or (ii) to
the extent available, Seller will allow the Purchaser
to apply the full purchase price of the Lot to another
lot within River Landing and will pay the same closing
costs in such transaction as Seller paid at the
closing of the original purchase of the Lot all as
shown on the Settlement Statement for the closing on
the Lot. *(iii) Seller will return all monies,
including all closing cost[s] to purchaser. This
provision shall survive the closing of the transaction
contemplated herein.[1]

Addendum B to Purchase Agreement [DE #1-2].

At the time plaintiff received the proposed Lot Purchase Agreement, he also received a HUD Property Report dated March 28, 2007, which contained numerous disclosures about the Bluffs and included a discussion of the high fecal coliform level. Plaintiff was concerned that future HUD statements would contain this language and thereby taint the value of the property. He was assured by Mac Rogerson that once the fecal coliform had deteriorated to acceptable levels, the future HUD reports would not contain this information. Plaintiff signed the agreement on April 5, 2007. The closing on the Lot occurred on September 7, 2007. The closing occurred through the mail. The closing attorney was Richard Burrows, defendant's long-time attorney. Defendant paid all plaintiff's closing costs, including

---

[1] Subsection (iii) was added by plaintiff in plaintiff's own handwriting.

4

attorney's fees and eighteen months of interest and homeowners' dues, totaling $29,525.03.

On or about October 31, 2007, defendant mailed a letter ("the Notice Letter") to plaintiff stating that defendant had received the confirmatory report. Plaintiff states he did not receive the Notice Letter until November 3, 2007. The letter stated that the North Carolina Division of Water Quality has found that "no additional monitoring is needed at this time and the matter can be considered closed." (Sanderford Aff. ¶ 15.)

Plaintiff contends that the letter was not received timely and that it misrepresented key facts and omitted others. It appears these contentions arise from the fact that the Clark Group did not do the actual sampling from May to October 2007. Instead, Murphy Farm employees took the samples and sent them to the Clark Group for testing. Plaintiff finds this objectionable because defendant was owned by the same family who owned Murphy Farms. Plaintiff also notes that, according to the letter defendant received from the North Carolina Division of Water Quality regarding the matter ("the NCDWQ Letter"), the fecal coliform level in one groundwater well was above applicable state and federal standards at the time last tested before November 1, 2007. (See NCDWQ Letter, Sanderford Aff. ¶ 17, Ex. 3 ("The most recent surface water samples are compliant with

5

established standards and only one monitoring well showed slightly above groundwater standards.").) This was not mentioned in the Notice Letter plaintiff received.

After receiving the October 31, 2007 Notice Letter which plaintiff contends is untimely, plaintiff was still concerned with whether the HUD reports would continue to show the fecal coliform issue. He called Mac Rogerson who advised him a revised HUD report would be forthcoming and would show no contamination. Plaintiff checked on this matter with Mac Rogerson several times. A new HUD report dated May 2007 was finally provided, but the newer report still contained the information about the fecal coliform. At that point, plaintiff contacted an attorney to begin efforts to get his money back.

In the Fall of 2008, plaintiff's counsel made several attempts to contact defendant via letter. When there was no response, plaintiff filed suit against defendant in state court in February 2009 asserting claims for specific performance and, alternatively, rescission of the Lot Purchase Agreement. Plaintiff notes that at the time he filed the suit in state court he was unaware of the contents of the NCDWQ letter or the fact that the Clark Group had not collected the samples.

On April 26, 2010, plaintiff voluntarily dismissed the above-referenced state court action without prejudice. On

6

November 18, 2010, plaintiff filed the instant action with claims for specific enforcement, unfair and deceptive trade practices, fraud, and violation of the Interstate Land Sales Full Disclosure Act (ILSFDA).

## COURT'S DISCUSSION

I. **Standard of Review**

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues. Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead,

a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

## II. Analysis

Plaintiff argues that defendant breached the contract in several ways and seeks specific enforcement of the contract. First, plaintiff argues that defendant did not provide plaintiff with notice of the Confirmatory Report on or before November 1, 2007, and that plaintiff is therefore entitled to the remedies described in Addendum B. Neither Addendum B nor the contract contains a definition of the term "Notify." Plaintiff argues that because notification was not received by November 1, 2007, the defendant breached the contract. Defendant argues that its

8

notification responsibility was fulfilled upon mailing the Notice on October 31, 2007. Because the parties' inartfully drafted addendum does not define "notice" in any way, the court construes the term notice to mean actual notice, especially in light of the fact that defendant drafted the addendum. However, under North Carolina law, "[t]ime is ordinarily not of the essence in a contract of sale and purchase." Douglass v. Brooks, 242 N.C. 178 (1955). Because Addendum B contains no "time is of the essence" clause and because Notice was received on November 3, 2007, a mere two days later than the contract provided, the court finds that defendant performed within a reasonable time, even though it did not comply with the "strict terms of the contract." Taylor v. Longworth, 39 U.S. 172, **2 (1840). Whether a party has performed within a reasonable time is ordinarily a mixed question of law and fact. However, when the facts are simple and admitted, as here, what constitutes a "reasonable time" is a question of law. J.B. Colt. Co. v. Kimball, 190 N.C. 169, 174, 129 S.E. 406, 409 (1925). The court finds, as a matter of law, that defendant provided notice within a reasonable time. Furthermore, plaintiff has shown no prejudice from the delay in receipt of two days.

Plaintiff also argues that defendant breached the contract because the Clark Group did not do the sampling on the property,

9

but rather defendant used employees of another company affiliated with defendant to do the sampling. However, at all relevant times the Clark Group was involved in monitoring and/or assessing the status of the property. While it is true that defendant used employees of a sister company to take the physical samples, the analysis of these samples was performed by the Clark Group, and the North Carolina Division of Water Quality indicated that the fecal coliform had degraded to acceptable levels and that the matter could be considered closed. The court finds no breach or misrepresentation in the use of another company for the taking of the sampling in light of the Clark Group's oversight of the process.

Plaintiff also argues that defendant misrepresented in its October 31, 2007 Notice Letter that it had received a Confirmatory Report. Plaintiff contends that the NCDWQ letter does not constitute a confirmatory report because it notes that "one monitoring well showed slightly above groundwater standards." (NCDWQ Letter.) However, a review of the NCDWQ Letter reveals that the NCDWQ found the levels to be compliant with established standards. The letter concludes that no additional monitoring is needed and the matter can be considered closed. The NCSWQ letter, therefore, constitutes a satisfactory Confirmatory Report indicating that "fecal coliform has degraded

10

to an acceptable level" as required by Addendum B. The court finds no misrepresentation on the part of defendant. The court acknowledges that according to the NCDWQ Letter, one monitoring well showed slightly above groundwater standards. However, this fact did not keep the NCDWQ from closing the matter, and plaintiff has brought forth no evidence that this well has any effect on plaintiff's ability to begin construction on the Lot.

Furthermore, even if the court were to assume a material breach in the notice requirements of Addendum B, the court finds that Addendum B is an unenforceable contract. Addendum B provides, "If, the Seller does not receive the Confirmatory Report and notify Purchaser of the same by November 1, 2007, **then the Seller and Purchaser will agree to . . . ."** (Addendum B to Purchase Agreement [DE #1-2].) In order for a remedy to arise, the parties must agree on the remedy, thereby leaving open essential parts of the contract to future agreement. Such an "agreement to agree" is unenforceable. Lefever v. Taylor, 198 N.C. App. 405, 2009 WL 2177323, *6 (2009) (quoting County of Jackson v. Nichols, 175 N.C. App. 196 (2005) ("It is well settled that a contract leaving material portions open for future agreement is nugatory and void for indefiniteness.")). Here, the court would be required to supply material terms not contained within the Addendum itself, such as reconveyance of

11

the property to the seller. See Chappell v. Roth, 353 N.C. 690, 692, 548 S.E.2d 499, 500 (2001) (finding that a document that merely expresses the intent and desires of the parties, rather than their agreement, and which leaves no means to settle the unresolved terms, is not enforceable as a contract).

Finding no breach and no misrepresentation on the part of defendant as well as an unenforceable contract addendum, plaintiff's claims for specific performance, fraud, unfair and deceptive trade practices, and ILFSDA violations are dismissed.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted [DE #24]. All other pending motions are deemed moot. The clerk is directed to close this case.

This 14th day of February 2012.

*(signature)*
Malcolm J. Howard
Senior United States District Judge

At Greenville, NC
#26